**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ENLITIC, INC.,                                    )
                                                  )
                            Plaintiff,            )
                                                  )
            v.                                    )
                                                  )     C.A. No. _____
                                                  )
JAMES MICHAEL CONYERS,                            )
                                                  )
                            Defendant.            )


**PLAINTIFF ENLITIC INC.'S MEMORANDUM IN SUPPORT OF *EX PARTE* MOTION**
**FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY**
**PRELIMINARY INJUNCTION SHOULD NOT ISSUE, AND**
**ORDER PERMITTING EXPEDITED DISCOVERY**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 2

    A.    Enlitic is a Pioneer in the Healthcare AI Industry ................................... 2

    B.    Enlitic Protects Its Confidential and Trade Secret Information. .............. 3

    C.    Conyers Agreed to Protect Enlitic's Trade Secrets and Gained Access to
Such Information Through His Employment. ........................................... 6

    D.    Conyers Stole Enlitic's Trade Secrets and Property in Breach of His
Agreement and the Defend Trade Secrets Act ("DTSA"). ...................... 6

        1.    Conyers started a new company to compete with Enlitic. ............. 7

        2.    Conyers surreptitiously connected a hard drive to Enlitic's
network. .......................................................................................... 9

        3.    Conyers downloaded Enlitic's confidential information and
uploaded that information to his OneDrive and Dropbox accounts. ....... 10

        4.    Other suspicious activities. .......................................................... 11

    E.    Conyers has not complied with Enlitic's reasonable investigation demand. ........ 11

III.  LEGAL STANDARD .......................................................................................... 12

IV.   ARGUMENT ....................................................................................................... 13

    A.    Enlitic is Likely to Succeed on the Merits of its Claims Against Conyers. .......... 13

        1.    Enlitic is likely to succeed on its breach of contract claim. ..................... 13

        2.    Enlitic is likely to succeed on its DTSA claim. .......................... 15

            a.    Enlitic's AI tools and underlying code qualify as trade
secrets. ............................................................................. 15

            b.    Conyers acquired Enlitic's trade secrets by improper means
and without Enlitic's consent. .......................................... 17

    B.    Enlitic will suffer irreparable harm if Conyers is not enjoined. .............. 17

    C.    The balance of equities favors granting a TRO. ..................................... 18

    D.    Public interest favors granting a TRO. .................................................... 18

    E.    Enlitic should not be required to post a bond in connection with the TRO. ........ 19

    F.    The Court should permit narrow, targeted discovery. ............................ 19

V.    CONCLUSION .................................................................................................... 20

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Huizar*,
　　52 P.3d 816 (Colo. 2002) ......................................................................13

*API Tech. Srvs., LLC v. Francis*,
　　No. 4:13-CV-142, 2013 WL 12131381 (E.D. Va. Dec. 4, 2013) ...........................18

*Apollo Enter. Imaging Corp. v. Conyers*,
　　No. 1:19-CV-1603-LMB-MSN, 2020 WL 1896706 (E.D. Va. Jan. 10, 2020) .................2, 17

*Aponte v. Allstate Fire & Cas. Ins. Co.*,
　　No. 1:21-CV-01601-CNS-SKC, 2023 WL 129693 (D. Colo. Jan. 9, 2023) ........................13

*Arctic Energy Servs., LLC v. Neal*,
　　No. 18-CV-00108-PAB-KLM, 2018 WL 1010939 (D. Colo. Feb. 22, 2018).................15, 16

*Baker Hughes Oilfield Operations, Inc. v. Beard*,
　　No. 15-CV-02231-PAB-KMT, 2016 WL 471390 (D. Colo. Feb. 8, 2016)...........................13

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
　　No. 18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) .........................16, 19

*Complete Fire Prot., Inc. v. Kolman*,
　　No. 19-CV-1134-WJM-STV, 2019 WL 1755280 (D. Colo. Apr. 19, 2019)...................17, 18

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*,
　　415 U.S. 423 (1974).....................................................................12

*Haggard v. Spine*,
　　No. 09-CV-00721-CMA-KMT, 2009 WL 1655030 (D. Colo. June 12, 2009)......................17

*Henry Schein, Inc. v. Cook*,
　　191 F. Supp. 3d 1072 (N.D. Cal. 2016) ................................................18

*JPMorgan Chase Bank, N.A. v. Soderquist*,
　　No. 11-CV-00445-WYD-CBS, 2011 WL 742549 (D. Colo. Feb. 24, 2011) .........................20

*Luckyshot LLC v. Runnit CNC Shop, Inc.*,
　　No. 19-CV-03034-RBJ, 2020 WL 5702281 (D. Colo. Sept. 24, 2020)...................16

*NRC Broad. Inc. v. Cool Radio, LLC*,
　　No. 09-CV-02076-REB, 2009 WL 2965279 (D. Colo. Sept. 14, 2009).................12

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Panorama Consulting Sols., LLC v. Armitage*,
No. 17-CV-01400-RM, 2017 WL 2929549 (D. Colo. July 10, 2017)....................................17

*Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liab. Co.*,
204 F.R.D. 675 (D. Colo. 2002) .......................................................................................19

*Satcom Sol. & Res. LLC v. Pope*,
No. 19-CV-02104-CMA-GPG, 2020 WL 4511773 (D. Colo. Apr. 20, 2020),
*report and recommendation adopted*, No. 19-CV-02104-CMA-NRN, 2020
WL 2188922 (D. Colo. May 6, 2020).............................................................................15, 16

*Semitool, Inc., v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002).........................................................................................20

*WeRide Corp. v. Kun Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-
EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019).................................................................16

*Western Distrib. Co. v. Diodosio*,
841 P.2d 1053 (Colo. 1992).................................................................................................13

*Winnebago Tribe of Neb.v. Stovall*,
341 F.3d 1202 (10th Cir.2002) ...........................................................................................19

*Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*,
No. 07–CV–02324–WYD–MEH, 2008 WL 2185882 (D. Colo. May 23, 2008)...................19

**Statutes**

Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.* ........................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure
26..........................................................................................................................19, 20
65....................................................................................................................12, 13, 19

## I.    INTRODUCTION

James Michael Conyers, Enlitic's former Chief Executive Officer, stole valuable and proprietary code, including source code for Enlitic's most important artificial intelligence ("AI") platform, and apparently intends to use that confidential information to compete with the Company. Enlitic has invested millions of dollars in research and development to earn a place as an innovator and leader in its industry. The Company focuses the power of AI into data management applications in the healthcare industry, enabling effective administration, processing, and sharing of patient data throughout the healthcare enterprise. To that end, Enlitic develops code to power its existing AI solutions and those it intends to bring to market in the future. Conyers' misappropriation of the Company's proprietary data imperils Enlitic's hard-won technological and competitive advantages.

Enlitic is entitled to a temporary restraining order ("TRO") because: (1) evidence shows Conyers stole documents and proprietary information, including trade secrets and confidential information; (2) Conyers poses an imminent threat to Enlitic's market position; (3) the balance of harms favors the Company whose trade secrets are jeopardized by Conyers' trade secret misappropriation; and (4) the public interest would be served by upholding Enlitic's ownership rights in the trade secrets that it developed and that provide it a competitive advantage in the marketplace.

This is not simply a case of a careless employee who inadvertently kept materials when he left the Company's employ. Conyers expended substantial effort downloading thousands of files from the Company's servers and from GitHub, an online code-building and hosting site, uploading that information to his Dropbox account, and moving the information from there to destinations

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

unknown.  He did this just before his employment at the Company was terminated for cause, knowing that he might soon be leaving Enlitic.  Furthermore, this is not the first time Conyers has absconded with confidential information, having previously been temporarily restrained and preliminarily enjoined as a result of his misappropriation of a former employer's trade secrets, in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.* ("DTSA").[1]

For each of the reasons described in this motion and in Enlitic's Complaint, Enlitic respectfully requests that the Court issue a temporary restraining order that enjoins Conyers' unlawful activities, allows Enlitic to take emergency discovery, and that requires Conyers to show cause why a preliminary injunction should not issue.

## II.    STATEMENT OF FACTS

### A.    Enlitic is a Pioneer in the Healthcare AI Industry

Enlitic's goal is to "develop the world's first real-world, connected, evidence based platform" that will make decades of patient and treatment data available and "interchangeable across any critical care system anywhere in the world."  (Sistenich Decl. ¶ 5.)  To implement this vision, the Company continues to invest resources and energy into developing new products.  (*Id.* at ¶ 4.)  These products include:

- Enlitic|Curie™, an AI database and evidence platform that allows implementation of Enlitic application modules or third party AI algorithms.  The Enlitic|Curie™ platform features a host of AI-powered applications that enable data standardization, retrospective and real-time analysis, research, risk mitigation, and workflow simplification—creating

---

[1] *See Apollo Enter. Imaging Corp. v. Conyers*, No. 1:19-CV-1603-LMB-MSN, 2020 WL 1896706, at *1 (E.D. Va. Jan. 10, 2020).

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

more time for healthcare professionals and improving patient outcomes.

- Curie|ENDEX™, an application that uses AI for medical imaging to transform imaging
  data to a consistent, clinically relevant standard nomenclature, and enables relevant clinical
  content linkage across different IT systems.

- Curie|ENCOG™, an AI tool that keeps all clinically relevant information in medical
  records while removing and protecting all Protected Health Information ("PHI"), auditing
  activities, and maintaining a chain of custody, allowing rapid viewing and dissemination
  of records while accounting for confidentiality obligations.

- Curie|ENCODE™, a healthcare billing and coding tool that is currently in development.

(*Id.* at ¶ 8.)   All of these tools, and the code underlying them, are proprietary to Enlitic and
disclosure of the source code or trade secrets used to develop and operate any of these tools would
fundamentally threaten Enlitic's business.  (*Id.*)

## B.      Enlitic Protects Its Confidential and Trade Secret Information.

Enlitic's code and AI projects derive substantial value from being kept confidential.
(Sistenich Decl. ¶ 9-12; Lennartson Decl. ¶ 6.)  That is why Enlitic closely guards its proprietary
information, using a variety of measures to maintain their secrecy.  (Lennartson Decl. ¶ 7-15.)

Enlitic requires that employees with access to proprietary information sign a Confidential
Information and Invention Assignment Agreement ("Confidentiality Agreement," Exs. A and E).[2]
(*Id.* at ¶ 8.)  Pursuant to the Confidentiality Agreement, employees agree not to disclose Enlitic's
confidential and trade secret information to third parties; not to use Enlitic's confidential and trade

---

[2]  All citations to "Ex. __" refer to exhibits to the Declaration of Ryan Lennartson, filed
concurrently herewith.

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

secret information except in the performance of their job duties; and to return to the Company all
confidential and trade secret information in their possession when their employment ends.  (Ex.
E.)  Specifically, the Confidentiality Agreement provides:

- "At all times during and after Employee's employment, Employee will hold in confidence
  and will not disclose [or] use . . . any of the Company's Confidential Information . . ." (*Id*.
  at 1.).  "Confidential Information" includes "trade secrets, inventions, mask works, ideas,
  processes, formulas, ***software in source or object code***, data, programs, other works of
  authorship, know-how, improvements, discoveries, developments, designs and techniques
  and any other proprietary technology." (*Id*. (emphasis added).)

- Employees are prohibited from "directly or indirectly engaging in any employment or
  business activity which is directly or indirectly competitive with, or would otherwise
  conflict with, Employee's employment with the Company" without permission from
  Enlitic.  (*Id*. at 3.)

- Employees must agree to inform Enlitic, for a period of one year following the end of their
  employment, of "all employment and business ventures which Employee enters." (*Id.* at 4.)

- When employees leave the Company, they must return all Company Property to Enlitic,
  including "all drawings, notes, memoranda, specifications, devices, formulas, and
  documents, together with all copies thereof, and any other material containing or disclosing
  any Company Inventions, Third Party Information or Confidential Information of
  Company." (*Id*. at 4.)

- Employees must agree that they will not "copy, delete, or alter any information contained"
  on their company computer or company equipment before returning it to the Company.

(*Id.*)  Further, if employees "have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information," they must agree to provide the Company "with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems."  (*Id.*)  Employees must agree to provide Enlitic access to their personal systems "as reasonably requested to verify that the necessary copying and/or deletion is completed."  (*Id.*)

Enlitic also maintains policies that require employees to take measures to maintain the confidentiality of the Company's proprietary information as outlined in its Employee Handbook (Ex. B), including among other precautions:

- Only accessing the Company's confidential or proprietary information when authorized to do so on a "need to know" basis (Ex. B at 34);

- Only connecting personal devices to "bring your own device" networks and not connecting personal devices to other Enlitic networks without authorization from IT (*Id.* at 20);

- Documenting the use of personal devices for work-related purposes in the form of written approval by a manager (*Id.*); and

- Securing all sensitive and confidential information when not at their workstation (*Id.* at 21).

To ensure its employees understand and respect these policies, Enlitic requires employees to undergo training on protecting the Company's confidential and trade secret information. (Lennartson Decl. ¶ 12.) When an employee leaves the Company, Enlitic employs additional precautions to prevent misappropriation, including reminders stressing the importance of the former employee's continuing confidentiality obligations.  (*Id.* ¶ 13.)  Enlitic also uses physical

and data security measures to protect its confidential and trade secret information.  (*Id*. ¶ 14.)  The

Company restricts access to its facilities and uses passwords, encryption, and multi-level

authentication to protect its data.  (Bonney Decl. ¶ 5-7.)

> ### C.    Conyers Agreed to Protect Enlitic's Trade Secrets and Gained Access to Such Information Through His Employment.

Conyers joined Enlitic on May 3, 2021 as the Company's Chief Operating Officer.

(Lennartson Decl. ¶ 16.)  He was promoted to the position of Chief Executive Officer in November

2021.  (*Id*. at 20.)  As a condition of his employment, Conyers signed the Confidentiality

Agreement on April 25, 2021.  (*Id*. at ¶ 17; Ex. A.)  He executed the most recent version of the

Confidentiality Agreement, which contains all of the provisions listed above, on March 8, 2022.

(Lennartson Decl. ¶ 18; Ex. E.)  Furthermore, Conyers agreed that the Confidentiality Agreement

"does not prevent Employee from earning a living or pursuing Employee's career" and that "the

restrictions contained in [the Confidentiality Agreement] are reasonable, proper, and necessitated

by Company's legitimate business interests."  (Ex. E at 3.)  As an additional condition of his

employment, Conyers was required to review and sign the Employee Handbook and participate in

employee confidentiality training. (Lennartson Decl. ¶ 19; Ex. F.)  Conyers signed his Employee

Handbook acknowledgment form on January 23, 2023.  (Lennartson Decl. ¶ 21; Ex. F.)

During his employment, Conyers had access to, and was entrusted with, Enlitic's

confidential and trade secret information.  (Lennartson Decl. ¶ 22.)

> ### D.    Conyers Stole Enlitic's Trade Secrets and Property in Breach of His Agreement and the Defend Trade Secrets Act ("DTSA").

Conyers behaved suspiciously in the months preceding his termination.  His behavior was

only discovered just prior to and following Conyers' termination for cause on February 24, 2023,

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

when Thea Moeller, Conyers' former executive assistant, informed the Company of Conyers' suspicious actions, triggering an investigation by the Company. (Lennartson Decl. ¶ 23.) Once the Company was aware of Conyers' actions, it engaged counsel and hired a forensic expert to analyze Enlitic's systems in an effort to investigate those actions and determine the extent of the Company's possible risk exposure. (Lennartson Decl. ¶ 23.)

### 1.    Conyers started a new company to compete with Enlitic.

Conyers first expressed to Ms. Moeller plans to leave Enlitic on or about October 2, 2022. (Moeller Decl. ¶ 2.) Shortly thereafter, Enlitic's planned Series C fundraising round fell through, requiring the Company to reduce its workforce. (*Id*. at ¶ 3.) Between October 2, 2022 and October 18, 2022, Conyers told Ms. Moeller that if Conyers were fired or decided to leave Enlitic, he would start his own business using Curie|ENCODE™, Enlitic's proprietary billing and coding technology which is under development. (*Id*. at ¶ 4.)

On October 18, 2022, Conyers instructed Ms. Moeller to purchase an Apple MacBook Pro (Serial No. T9M6RNP4NW) with certain hardware specifications, which Conyers stated he would use to build "Reactic," the name of the new company he intended to found. (*Id*. at ¶ 5.) Conyers asked Ms. Moeller to purchase the computer with Enlitic Apple credits, which he did not believe could be tracked.[3] (*Id*.) Ms. Moeller delivered the computer to Conyers on November 18, 2022. (*Id*.)

Following the termination of Conyers' employment on February 24, 2023, Ms. Moeller

---

[3] On October 11, 2022, Conyers sent Ms. Moeller a receipt for a separate laptop purchased outside the normal procurement channels for Paul Kelly, a former Enlitic employee whose employment was terminated for cause on January 5, 2023. (Moeller Decl. ¶ 6.) Conyers instructed Ms. Moeller to expense the purchase to the Company. (*Id*.)

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

reviewed a paper notebook belonging to Conyers, which he had left in the office, containing handwritten notes recording ideas for business names, including "reactive AI" and "reaktus"— similar to the name Conyers told Ms. Moeller he had chosen for his new company.  (*Id*. at ¶ 22-25.)  The notebook also revealed that Conyers had created a checklist of tasks he needed to accomplish to start his new business.  (*Id*. at ¶ 23.)  These tasks included registering an LLC, registering a domain name (this task was crossed off), developing a website, creating a funding plan, retaining "Corey" as an advisor,[4] developing a contact and relationship plan, creating a pitch deck, and other tasks.  (*Id*.)  Conyers specifically requested that Ms. Moeller return this notebook to him, and that only she view its contents.  (*Id*. at ¶ 22.)

The domain name "reacticai.com" was registered on October 22, 2022.[5]  Trent Walton, the forensic investigator contracted by Enlitic, discovered that Conyers, via his Company-issued computer,[6] signed into the email address "jim@reacticai.com" on November 11 and 14, 2022. (Walton Decl. ¶ 12.)  On January 6, 2023, Conyers created a document on his Company-issued computer that appears to contain notes on "reacticai.com," including user interface notes.  (*Id*.) And Conyers visited the website "reacticai.com" on January 9, 2023, indicating the site may have gone live on that date.  (*Id*.)

The "reacticai.com" website is currently viewable on the internet today.[7]  The website states that Reactic AI is "dedicated to the development of advanced AI technologies that directly

---

[4] Corey Schmid is a CEO advisor who was contracted by Enlitic to teach Conyers how to be a CEO.  (Moeller Decl. ¶ 23.)

[5] *See* https://www.whatsmydns.net/domain-age?q=reacticai.com.

[6] This Company-issued computer is a Lenovo ThinkPad LPT, Model 20TK-001HUS, Serial No. R9-13HKC3.  (Walton Decl. ¶ 11; Bonney Decl. ¶ 12.)

[7] *See* https://reacticai.com.

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

impact the clinical workflow" for healthcare providers and advertises that it aims to solve for lost revenue due to healthcare billing and coding errors.  Reactic AI's business is remarkably similar to that of Enlitic and specifically purports to solve for a market need addressed by Curie|ENCODE™, the very same program Conyers told Ms. Moeller he would use to build his new business.

**2.**     **Conyers surreptitiously connected a hard drive to Enlitic's network.**

Ms. Moeller worked in Enlitic's office on January 1-2, 2023, in order to catch up with work due to a vacation she had recently taken.  (Moeller Decl. ¶ 9.)  One of those days, while she and Conyers were alone in the office, Conyers entered Ms. Moeller's office with a hard drive, stated it was not working properly in his office, and requested that Ms. Moeller allow him to plug it in in her office.  (*Id*.)  Conyers returned later to collect the device.  (*Id*.)  After Conyers' termination, he requested that Ms. Moeller return the hard drive to him.  (*Id*. at ¶ 22.)  Upon investigation on February 25, 2023, after being notified by Ms. Moeller of the existence of a network-attached storage device, Enlitic located the hard drive under the unoccupied and unused desk of a former employee.  (Bonney Decl. ¶ 25.)  The Company discovered that this device[8] had first been connected to the Company's network on December 22, 2022.  (*Id*.)  Enlitic investigated the network history of the hard drive on February 27, 2023, and discovered about 790 MB of network activity over the previous 30 days, with the majority of that activity occurring on February 1 and 2, 2023.  (*Id*. at ¶ 31.)

---

[8] This device was a Western Digital MyCloud Home Model GIC BFAJMA 0718Q, Serial No. WCC7K2LSENF7. (Walton Decl. ¶ 11.)

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

### 3. Conyers downloaded Enlitic's confidential information and uploaded that information to his OneDrive and Dropbox accounts.

On February 27, 2023, Enlitic restored about 1,500 files that had been deleted from Conyers' company Dropbox[9] account.  (Bonney Decl. ¶ 28.)  Among those files was Enlitic's source code.  (*Id*. at ¶ 29.)  The Company identified a pattern of activity where Conyers repeatedly uploaded files to Drobox and then deleted them 15-20 minutes later.  (*Id*. at ¶ 28.)  On February 28, 2023, Enlitic discovered that Conyers had accessed GitHub (an online hosting and code-building site) on January 2, 2023 and downloaded the source code repository for Curie|ENDEX™, a proprietary AI tool related to medical imaging.  (*Id*. at ¶ 30; Sistenich Decl. ¶ 22.)  Conyers uploaded this source code repository to his DropBox account on February 20, 2023 at 10:58 a.m. and then deleted it at 11:15 a.m. on the same day.  (Bonney Decl. ¶ 30.)  Conyers also appears to have uploaded the source code for Curie|ENCOG™, an AI tool that removes personal health information from medical records, and Enlitic Curie™, the program upon which all of Enlitic's AI tools are built, to his OneDrive[10] account on February 21, 2023.  (*Id*. at ¶ 29.)

There is no legitimate business purpose justifying Conyers' downloading of Enlitic's code from GitHub, nor was there any legitimate business reason for Conyers to upload that code to his personal DropBox or OneDrive accounts.  (Sistenich Decl. ¶ 26-31.)  Furthermore, Conyers did not have permission from the Company to do so.  (*Id*. at ¶ 21.)

The Enlitic|Curie™ family of products is fundamental to the Company's business, took years to develop, and is highly valuable because it solves issues in healthcare that have been

---

[9] Dropbox is a cloud-based file hosting service.  (*See* https://www.dropbox.com.)
[10] Similar to Dropbox, Microsoft OneDrive is a cloud-based file hosting service.  (*See* https://www.microsoft.com/en-us/microsoft-365/onedrive/online-cloud-storage.)

present for decades.  (Sistenich Decl. ¶ 12.)  The platform and associated tools are multi-million

dollar assets.  (*Id*.)  Loss of the source code underlying these assets would devastate Enlitic's

business and cause irreparable harm.  (*Id*.)

### 4.    Other suspicious activities.

- On February 23, 2023, the day prior to Conyers' termination, Conyers requested that
  Enlitic's IT department "wipe" his company-issued laptop without creating a back-up.
  (Bonney Decl. ¶ 20.)

- Conyers traveled to Poland from February 12-16, 2023 (after he had downloaded Enlitic's
  source code from GitHub), purportedly to meet with contractors who were bidding on an
  Enlitic project.  (Moeller Decl. ¶ 13-20.)  On January 25, 2023, Conyers requested that Ms.
  Moeller purchase a flight for Conyers for this trip.  (*Id*. at ¶ 13.)  However, no meetings
  with contractors had yet been confirmed, and when Ms. Moeller contacted one of the
  contractors, that contractor was unaware of any meeting.  (*Id*. at ¶ 16-18.)  Furthermore,
  one of the contractors was based in California and it was illogical for Conyers to meet this
  contractor in Poland.  (*Id*. at ¶ 18.)  Conyers had never previously traveled to meet
  contractors.  (*Id*. at ¶ 16.)

### E.    Conyers has not complied with Enlitic's reasonable investigation demand.

On March 3, 2023, once the Company began to discover what Conyers had done, Enlitic's

counsel delivered by email and courier a letter demanding the return of the Company's confidential

information and property, and further demanding that Conyers submit his personal devices, cloud

or data storage accounts, and e-mail accounts for inspection by Enlitic so that the Company might

ensure Conyers no longer retained possession of its proprietary information.  (Ex. C.)  Conyers

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

responded by email on March 5, 2023. (Ex. D.) His email did not deny that he had formed Reactic

AI but claimed it was merely a website "playground." (*Id*.) Furthermore, Conyers failed to offer

any objectively reasonable explanations for uploading the source code for Enlitic's most important

products to his cloud-based storage accounts, and did not agree to a forensic investigation of his

personal devices, cloud or data storage accounts, and e-mail accounts. (*Id*.)

## III.  LEGAL STANDARD

A temporary restraining order preserves the status quo and prevents irreparable harm until

a hearing can be held on a preliminary injunction application. *See Granny Goose Foods, Inc. v.

Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The standard for

issuing a temporary restraining order is the same standard for issuing a preliminary injunction.

*NRC Bd. Inc. v. Cool Radio, LLC*, No. 09-CV-02076-REB, 2009 WL 2965279, at *1 (D. Colo.

Sept. 14, 2009). A movant seeking either remedy must show "(1) a substantial likelihood that the

movant eventually will prevail on the merits; (2) that the movant will suffer irreparable injury

unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever

damage the proposed injunction may cause the opposing party; and (4) that the injunction, if

issued, would not be adverse to the public interest." *Id*.; *see also* 18 U.S.C. § 1836(b)(3)(A) (court

may issue injunctive relief to prevent actual or threatened trade secret misappropriation).

In addition, a movant seeking the issuance of an *ex parte* TRO must satisfy Federal Rule

of Civil Procedure 65(b), which requires a showing "that immediate and irreparable injury, loss,

or damage will result to the movant before the adverse party can be heard in opposition" and

certification of "efforts made to give notice and the reasons why it should not be required." Fed.

R. Civ. P. 65(b)(1)(A).

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

## IV.   ARGUMENT

### A.   Enlitic is Likely to Succeed on the Merits of its Claims Against Conyers.

Enlitic seeks this TRO based on two causes of action—Defendant's breach of contract and his violation of the DTSA.

#### 1.   Enlitic is likely to succeed on its breach of contract claim.

To prove a breach of contract claim, a plaintiff must show: (1) the defendant entered into an enforceable contract; (2) the plaintiff performed as required by the contract or was justified in not performing; (3) the defendant failed to perform the contract; and (4) damages resulted to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).[11]   Under Colorado law, the words of a contract "should be given their plain meaning according to common usage." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).   *See also Aponte v. Allstate Fire & Cas. Ins. Co.*, No. 1:21-CV-01601-CNS-SKC, 2023 WL 129693, at *3 (D. Colo. Jan. 9, 2023) ("plain and unambiguous" contract terms should be enforced as drafted).

The Confidentiality Agreement is a valid and enforceable contract under Colorado law. *See, e.g.*, *Baker Hughes Oilfield Operations, Inc. v. Beard*, No. 15-CV-02231-PAB-KMT, 2016 WL 471390, at *1 (D. Colo. Feb. 8, 2016) (granting injunctive relief based on alleged violations of a valid employee agreement).   Conyers signed and entered the Confidentiality Agreement as a condition of his employment and Enlitic held up its end of the bargain; it employed Conyers for nearly two years and paid him wages.

The Confidentiality Agreement clearly prohibits misuse of the Company's confidential information. (Ex. A Section 1.1 ("Recognition of Company's Rights; Nondisclosure").)   The

---

[11] The Confidentiality Agreement chooses Colorado law to govern disputes.  (Ex. E, Section 21.)

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

Confidentiality Agreement additionally required Conyers to return all Company Property to Enlitic when he left the Company's employ. (*Supra* at Section II.B.) He was likewise required to provide Enlitic with copies of any Enlitic confidential information contained on any of his personal devices, servers, or e-mail accounts and then delete that information. (*Id*.) After deleting that information, Conyers was contractually required to make those personal devices, servers, and email accounts available at the Company's request so that the Company could make sure Conyers had actually deleted the confidential information. (*Id*.)

Conyers violated the Confidentiality Agreement several times over by: (i) downloading thousands of confidential files to Company fileshare applications without reason or approval; (ii) uploading the Company's proprietary source code to DropBox without reason and under a false pretense; (iii) secretly attaching an external hard drive to the Company network for nearly four months without permission from Company IT; and (iv) misusing and misappropriating the Company's confidential information to start his own competing company. (*Supra* at Section II.D.) And Conyers has not made his personal devices, servers, or email systems available for Enlitic to review so that the Company can ensure its confidential information has been deleted.

Furthermore, Conyers violated the Confidentiality Agreement by competing with Enlitic's business while still in the Company's employ. (*Supra* at Section II.B.) Conyers admitted to his Executive Assistant, Ms. Moeller, that he intended to start a new company called "Reactic" using Enlitic's Curie|ENCODE™ AI tool. (*Supra* at Section II.D.1.) He then proceeded to register the domain name "reacticai.com" later that same month. (*Id*.) Reactic AI's website reveals that it purports to fill the very market need that Curie|ENCODE™ was specifically designed to address. (*Id*.)

In summary, Conyers stole Enlitic's source code and other trade secrets and seemingly

transferred that information out of Enlitic's control and then started a competing business called Reactic AI using Enlitic's stolen trade secrets. For all of these reasons, Enlitic has demonstrated a likelihood of success on the merits of its breach of contract claim against Conyers.

### 2.    Enlitic is likely to succeed on its DTSA claim.

A plaintiff asserting a claim for misappropriation of trade secrets under the DTSA must "establish: (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018); 18 U.S.C. § 1836(b)(1). The DTSA specifically contemplates the issuance of injunctive relief to maintain the confidentiality of trade secrets. *Id*. at §§ (a); (3).

#### a.    Enlitic's AI tools and underlying code qualify as trade secrets.

A "trade secret" is information that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information"; provided that (2) "the owner thereof has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A)(B). Enlitic's AI tools and underlying code clearly meet these requirements.

First, Enlitic's AI tools and underlying code derive independent economic value from not being generally known to, or ascertainable by, others. Courts routinely find that confidential information similar to that misappropriated by Conyers meets this test. *See, e.g.*, *Satcom Sol. &*

*Res. LLC v. Pope*, No. 19-CV-02104-CMA-GPG, 2020 WL 4511773, at *5 (D. Colo. Apr. 20,

2020), *report and recommendation adopted*, No. 19-CV-02104-CMA-NRN, 2020 WL 2188922

(D. Colo. May 6, 2020) (source code is a trade secret); *WeRide Corp. v. Kun Huang*, 379 F. Supp.

3d 834, 847 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620

(N.D. Cal. Nov. 5, 2019) (same).  As discussed *supra* at Section II.A. and D., Enlitic uses its highly

valuable trade secrets to develop products for customers nationwide and beyond.  It expended

much time and great resources to develop its products, which fill significant market needs and give

the Company a competitive advantage.

Second, Enlitic employs numerous safeguards to protect its trade secrets.  For example, the

Company:  (1) requires that employees with access to proprietary information sign a confidentiality

agreement; (2) provides policies in the Employee Handbook governing the handling and security

of confidential information; (3) trains employees on those policies; (4) employs various cyber and

physical security measures; and (5) conducts exit interviews stressing the importance of departing

employees' continuing obligations to protect Enlitic's confidential information.  *Supra* at Section

II.B.  Courts have repeatedly held that such efforts constitute reasonable secrecy measures.  *See,

e.g.*, *Neal*, 2018 WL 1010939, at *2 (a confidentiality agreement satisfied the requirement for

reasonable measures to maintain secrecy); *Luckyshot LLC v. Runnit CNC Shop, Inc.*, No. 19-CV-

03034-RBJ, 2020 WL 5702281, at *6 (D. Colo. Sept. 24, 2020) (an unexecuted confidentiality

agreement was a reasonable measure to maintain secrecy); *Comet Techs. U.S. of Am. Inc. v.

Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *4 (N.D. Cal. Mar. 15, 2018) (finding

non-disclosure agreements, exit interviews, limited access, and internal policies to protect sensitive

information constituted reasonable efforts to maintain secrecy).

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

            **b.**      **Conyers acquired Enlitic's trade secrets by improper means and without Enlitic's consent.**

Conyers secretly downloaded the Company's proprietary and sensitive source code, including code for Enlitic's most important AI tools, and did so without Enlitic's authorization and in clear violation of the law.  (*Supra* at Section II.D.)  Furthermore, Conyers clearly intends to misuse this sensitive information because he founded a company that will compete directly with Enlitic—Conyers himself admitted as much to Ms. Moeller.  (*Id.*)

Courts addressing similar alleged violations of the DTSA have issued temporary restraining orders, followed by preliminary injunctions.  *See, e.g.*, *Panorama Consulting Sols., LLC v. Armitage*, No. 17-CV-01400-RM, 2017 WL 2929549, at *3 (D. Colo. July 10, 2017) (converting a TRO to a preliminary injunction where a defendant had emailed himself documents containing a plaintiff's trade secrets); *Conyers*, 2020 WL 1896706, at *1 (granting a TRO and preliminary injunction against Conyers, ***the Defendant in this case***, for misappropriating trade secrets in violation of the DTSA, lying repeatedly about his actions, and failing to abide by the terms of the TRO).  Enlitic has demonstrated that it will likely succeed on its DTSA claim and is entitled to a TRO.

     **B.**      **Enlitic will suffer irreparable harm if Conyers is not enjoined.**

If a TRO is not issued, Conyers will continue to irreparably harm Enlitic's business.  *See Complete Fire Prot., Inc. v. Kolman*, No. 19-CV-1134-WJM-STV, 2019 WL 1755280, at *2 (D. Colo. Apr. 19, 2019) (holding a plaintiff would "likely suffer irreparable injury incapable of being remedied by money damages" if the defendant were not enjoined from "using or disseminating the trade secrets obtained" from the plaintiff or "engaging in business activities that compete" with the plaintiff); *Haggard v. Spine*, No. 09-CV-00721-CMA-KMT, 2009 WL 1655030, at *14 (D.

Colo. June 12, 2009) ("Injunctive relief is especially appropriate in non-competition cases because of the difficulty in proving money damages caused by illicit competition.").

Enlitic has presented evidence that Conyers has already started a new business, Reactic AI, and intends to use Enlitic's proprietary code to develop products for that company that compete directly with Enlitic's products. *Supra* at Section II.D.1. Each passing day brings greater risk that Enlitic will be irreparably harmed due to the misuse of its trade secrets. A TRO is justified under these circumstances.

### C.    The balance of equities favors granting a TRO.

The balance of equities favors Enlitic. Enlitic faces the undermining of its entire business and market position should Conyers use the Company's trade secrets to compete with Enlitic or disclose them to third parties. By contrast, Conyers would not experience any harm from an injunction forbidding unlawful activity—*i.e.*, misuse of Enlitic's trade secrets. To the extent Conyers claims additional harm, such harm is "self-inflicted" and does not factor into this analysis. *See API Tech. Srvs., LLC v. Francis*, No. 4:13-CV-142, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (citation omitted).

### D.    Public interest favors granting a TRO.

Injunctive relief serves the public interest when it requires a defendant to do "no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016). Further, "it is in the public interest to protect trade secrets, prevent unfair competition, and to enforce valid contracts." *Kolman*, 2019 WL 1755280, at *3 (granting a TRO for alleged misappropriation of trade secrets in violation of the DTSA). That is precisely what the requested TRO would do here—require

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

Conyers to refrain using, disclosing, or transporting Enlitic's confidential information; to account
for all such information through expedited discovery; and to return that information to Enlitic.

     **E.**      **Enlitic should not be required to post a bond in connection with the TRO.**

Under Federal Rule of Civil Procedure 65(c), district courts have "'wide discretion'" in
determining whether to require security for injunctive relief. *Winnebago Tribe of Neb. v. Stovall*,
341 F.3d 1202, 1206 (10th Cir.2002); *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07–
CV–02324–WYD–MEH, 2008 WL 2185882, at \*22 (D. Colo. May 23, 2008) (declining to require
a bond where defendants would suffer no harm). Here, there is no realistic likelihood of harm to
Conyers because Conyers "was never entitled to disclose or use the information" he took. *Comet*,
2018 WL 1990226, at \*6 (dispensing with the filing of a bond "because the TRO would simply
enjoin Defendant from doing something Defendant never had a right to do in the first place").

Further, Conyers agreed in the Confidentiality Agreement "that any threatened or actual
violation of this Agreement or any of its terms will constitute immediate and irreparable injury to
Company, and Company will have the right to enforce this Agreement and any of its provisions
by injunction, specific performance, or other equitable relief, ***without bond*** and without prejudice
to any other rights and remedies that Company may have for a breach or threatened breach of this
Agreement." (Ex. A Section 18 (emphasis added).) The Court should not require a bond here.
Nevertheless, Enlitic is willing to post bond if the Court so desires.

     **F.**      **The Court should permit narrow, targeted discovery.**

Federal courts have the authority to permit expedited discovery, prior to a Rule 26(f)
conference, upon a showing of good cause. *See* Fed. R. Civ. P. 26(d)(1); *Pod-Ners, LLC v. N.
Feed & Bean of Lucerne Ltd. Liab. Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002) (expedited discovery

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

is appropriate in cases involving injunctive relief); *JPMorgan Chase Bank, N.A. v. Soderquist*, No.
11-CV-00445-WYD-CBS, 2011 WL 742549, at *3 (D. Colo. Feb. 24, 2011) (granting a TRO and
expedited discovery).

Here, expedited discovery, consisting of a deposition of Conyers and a forensic
examination of his devices and storage accounts, is necessary to understand the nature and extent
of Conyers' misappropriation and to increase the likelihood that all of Enlitic's confidential
information is returned to the Company and removed from Conyers' possession. Conyers'
surreptitious activity suggests he may have taken other data and trade secrets of which Enlitic is
not yet aware, disclosed confidential information to third parties, stored that information on
devices unknown to Enlitic, or misused Enlitic's trade secrets in ways it has yet to discover. Any
potential prejudice from this limited discovery is minimal, not least because the "requested
information is relevant and will be produced in the normal course of discovery." *Semitool, Inc.,
v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).

## V.    CONCLUSION

For the foregoing reasons, the Court should issue the applied-for TRO and grant expedited
discovery in the form of a deposition and forensic review.

MEMO ISO *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER

Dated: March 8, 2023                        COOLEY LLP

                                            By:  */s/ Orion Armon*
                                                 Orion Armon, Bar No. 34923
                                                 oarmon@cooley.com
                                                 Andrew D. Barr, Bar No. 49644
                                                 abarr@cooley.com

                                            1144 15th Street, Suite 2300
                                            Denver, CO  80202-2686
                                            Telephone:    +1 720 566 4000
                                            Facsimile:    +1 720 566 4099

                                            *Attorneys for Plaintiff Enlitic, Inc.*

MEMO ISO *EX PARTE* MOTION FOR
                                           TEMPORARY RESTRAINING ORDER