**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ENLITIC, INC.,

      Plaintiff,

v.

JAMES MICHAEL CONYERS,

      Defendant.

JAMES MICHAEL CONYERS,          C.A. No._1:23-cv-00607-DOD-SKG

      Counterclaim Plaintiff,

v.

ENLITIC, INC.,

      Counterclaim Defendant.

## ANSWER AND COUNTERCLAIM

    Defendant James Michael Conyers ("Conyers" or the "Defendant"), by and through his undersigned attorneys, for his Answer and Counterclaim against Plaintiff Enlitic, Inc. ("Enlitic" or the "Plaintiff") files his Answer and Counterclaim as follows.

## NATURE OF THE ACTION

    1.    This is an action by Enlitic, Inc., a global healthcare information technology company, against its former Chief Executive Officer for stealing Company trade secrets and breaching his Confidential Information and Invention Assignment Agreement. An internal Company investigation has revealed that Conyers, while serving as Enlitic's CEO, secretly downloaded Enlitic's proprietary and confidential source code and plotted to use the code to directly compete with Enlitic. Because disclosure of Enlitic's unique and proprietary source code

technology would cause the Company immeasurable and irreparable harm, the Company asks this Court for expedited equitable relief.

**ANSWER:** Conyers admits the nature of this action . Conyers lacks sufficient information about an internal investigation to admit or deny it and therefore denies it. Otherwise, denied.

2.      Since its founding in 2014 as a healthcare information company, Enlitic has created a portfolio of valuable artificial intelligence and machine learning technologies with applications to the healthcare industry. Enlitic's products are embodied by its proprietary source code, which employs data governance capabilities and machine learning tools to solve a variety of logistical and data analysis challenges in the healthcare industry relating to radiology picture archiving and communication systems. (Declaration of Michael Sistenich ¶¶ 5-7.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

3.      Enlitic developed Enlitic|Curie™, its primary product and programming platform. Enlitic has also developed a series of applications that utilize the Enlitic|Curie™ platform to provide radiology imaging analysis, medical record archiving, and billing and medical coding systems. (*Id*. at ¶ 6.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

4.      The vast majority of the Company's value and revenue is generated from licensing executable versions of software products that are embodied in its proprietary source code. The Company's proprietary source code is confidential information not generally known or ascertainable by the public. (*Id*. at ¶ 7.)

**ANSWER:**  Denied.

5.      Enlitic does not share its confidential and trade secret information, including the source code of its Enlitic|Curie™ products, with the public or anyone outside Enlitic. (*Id.* at ¶ 11.)

**ANSWER:**  Denied.

6.      James Conyers joined the Company as its Chief Operating Officer in May 2021. In November 2021, Conyers was promoted to Chief Executive Officer. (*Id.* at ¶¶ 13, 16.) Upon being hired, Conyers entered a Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement") with Enlitic in which he, among other things: (i) assigned to Enlitic ownership of any and all "Inventions" (i.e., trade secrets, ideas, processes, formulas, discoveries, designs and techniques, etc.) conceived or worked on by Conyers during his employment, (ii) agreed to maintain written records of all such Inventions and make them available to Enlitic at all times, and (iii) promised not to misuse or disclose Enlitic's confidential information and to return it upon termination of his employment. Conyers executed the first version of the Confidentiality Agreement on April 25, 2021. (Ex. A.[1]) He executed the most recent, and operative, Confidentiality Agreement on March 8, 2022. (Ex. E.)

**ANSWER:**  Admitted that he signed the original Confidentality Agreement.  Otherwise, denied.

7.      In late February 2023, Conyers' executive assistant reported to Enlitic's management that she had seen Conyers engage in a variety of suspicious behaviors over the previous four months, including using Company funds to purchase personal technology, moving and then quickly deleting large batches of files in Company network applications, and connecting external hard drives to Company servers without approval. Most alarming, however, Conyers

---

[1]  All citations to "Ex. _" refer to exhibits to the Declaration of Ryan Lennartson, filed concurrently herewith.

confided in his assistant that he planned to use Enlitic's proprietary software to launch his own company that would compete with Enlitic. (Declaration of Thea Moeller ¶¶ 4.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

8.      Following the executive assistant's report, Enlitic senior management alerted the IT department, and soon thereafter terminated Conyers' employment for cause. (Declaration of Ryan Lennartson ¶¶ 23-24.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

9.      Enlitic also launched a forensic investigation into Conyers' pre-termination activity. The forensic investigation revealed that, over a period of several months prior to and in the days leading up to his termination, while still serving as CEO, Conyers had illegally downloaded and potentially exported thousands of megabytes of confidential Company data to an unknown secondary location. (Declaration of Ava Bonney ¶ 35; Declaration of Trent Walton ¶ 12.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

10.     Information syphoned from Enlitic's databases by Conyers—which is everything necessary to enable him to quickly and easily re-develop Enlitic's key proprietary products—includes the proprietary source code to the suite of Enlitic|Curie™ applications aimed at medical imaging and records analysis. (Bonney Decl. ¶ 35.)

**ANSWER:**  Denied.

11.     The only reasonable inference that can be drawn from this behavior is that Conyers intentionally and illegally stole vital Company information and retained it post-termination in order to use it to compete with Enlitic. Conyers' continued conduct violates the clear and

enforceable terms of the Company's Confidentiality Agreement and threatens imminent or inevitable misappropriation of Enlitic's trade secrets in violation of federal law.

**ANSWER:** Denied.

12.     As a result of Conyers' misappropriation of Enlitic's trade secrets, Enlitic will suffer immediate and irreparable harm unless the Court grants an injunction and temporary restraining order enjoining Conyers from further misappropriating the Company's trade secrets. Due to the sensitive nature of the trade secret technology in this case, the value of the trade secret technology to Enlitic as a going concern, and the extensive evidence of misappropriation, Enlitic asks this Court to grant the Company expedited injunctive relief.

**ANSWER:** Denied.

## PARTIES

13.     Plaintiff Enlitic, Inc. is a Delaware corporation with its principal place of business at 3420 East Harmony Road Suite 125, Fort Collins, CO 80528.

**ANSWER:** Admitted.

14.     Defendant James Conyers is an individual residing at 736 San Felipe Drive, Fort Collins, CO 80524.

**ANSWER:** Admitted.

## JURISDICTION

15.     The Court has federal question jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Specifically, Enlitic alleges Defendant Conyers violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.*, by intentionally misappropriating Enlitic's trade secret technology. The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c)(4).

**ANSWER:** Admitted.

16.     The Court also has personal jurisdiction over Conyers because he is a Colorado resident and because he executed the Confidential Information and Invention Assignment Agreement, which provides in relevant part that "[e]mployee hereby expressly consents to the personal jurisdiction and venue of the state and federal courts located in Colorado for any lawsuit filed there against Employee by Company arising from or related to this Agreement."

**ANSWER:** Admitted.

17.     This Court is the appropriate venue to maintain this action pursuant to 28 U.S.C. 1391(a), because Conyers resides in this judicial district.

**ANSWER:** Admitted.

**FACTS**

**A.    Enlitic Develops Novel Healthcare Information Technologies.**

18.     Enlitic is a healthcare information technology company with headquarters in Fort Collins, Colorado.

**ANSWER:** Admitted.

19.     Founded in 2014, Enlitic uses machine learning and artificial intelligence tools and applies them to decades-old clinical workflow issues to streamline the healthcare process and free up clinicians and radiologists to deliver quality care. (Sistenich Decl. ¶ 5.) Enlitic's AI-powered applications analyze imaging data, streamline medical record retention, review, and sharing, and address inefficiencies in medical billing. This helps practitioners better analyze data and streamline managerial or administrative tasks to minimize the deficiencies. (*Id*. ¶ 9.)

**ANSWER:** Denied.

20.     Enlitic's products include:

- Enlitic|Curie™, an AI database and evidence platform that allows implementation of Enlitic application modules or third-party AI algorithms. The Enlitic|Curie™ platform features a host of AI-powered applications that enable data standardization, retrospective and real-time analysis, research, risk mitigation, and workflow simplification—creating more time for healthcare professionals and improving patient outcomes.

- Curie|ENDEX™, an application that uses AI for medical imaging to transform imaging data to a consistent, clinically relevant standard nomenclature and enables relevant clinical content linkage across different IT systems.

- Curie|ENCOG™, an AI tool that keeps all clinically relevant information in medical records while removing and protecting all protected health information, auditing activities, and maintaining a chain of custody.

- Curie|ENCODE™, a healthcare billing and coding tool.

**ANSWER:** Conyers admits that this allegation recites names of products. Otherwise, denied.

21.     Enlitic has invested heavily in research and development of its Enlitic|Curie™ platform, the Company's foundational program upon which Enlitic builds its marketable tools and products. Enlitic was the first U.S. imaging AI Company to receive regulatory approval to commercialize in Japan, has been named a top-10 AI healthcare company by AIMagazine, and has partnered with companies like GE Health and Vital Radiology Services to deploy AI enabled tools in hospitals around the world. Since its inception, the Company has achieved technological breakthroughs in the application of proprietary AI algorithms to solving problems in the healthcare industry, especially around the use, processing, sharing of medical images generated by radiology departments. (*Id.* at ¶ 6.)

**ANSWER:** Conyers admits that Enlitic has obtained regulatory approval in Japan and has been named in magazines. Otherwise, denied.

22.     Substantially all of Enlitic's revenue and value is generated from the range of Enlitic|Curie™ products built on Enlitic's proprietary source code. (*Id.* at ¶ 7.) The source code is

fundamental to the Company's business, took years to develop, and is highly valuable because it solves issues in healthcare that have been present for decades. The platform is worth hundreds of millions, if not billions, of dollars to Enlitic. (*Id.* at ¶ 12.)

**ANSWER:** Denied.

**B.     Enlitic Strictly Protects its Confidential Trade Secret Technologies.**

23.     Enlitic's proprietary source code and the range of Enlitic|Curie™ products are confidential materials, are not generally known or ascertainable by the public, and would not be ascertainable without substantial expenditure of time, effort, and resources. (Sistenich Decl. ¶ 10.)

**ANSWER:** Denied.

24.     Enlitic's products derive substantial economic value from not being generally known or readily ascertainable by Enlitic's competitors or the general public. (*Id.*)

**ANSWER:** Denied.

25.     Enlitic does not share its confidential information, including the source code of its products, with the public or anyone outside the Company, except as necessary for clients or prospective clients who enter into licensing agreements or non-disclosure agreements requiring the maintenance of strict confidentiality. (*Id.* at ¶ 11; Lennartson Decl. ¶ 7.)

**ANSWER:** Denied.

26.     Enlitic also requires that employees with access to confidential information sign a Confidentiality Agreement. (Ex. E, Lennartson Decl. ¶ 8.)

**ANSWER:** Admitted.

27.     Pursuant to the Confidentiality Agreement, employees agree not to disclose Enlitic's confidential and trade secret information to third parties; not to use Enlitic's confidential and trade secret information except in the performance of their job duties; and to return to the

Company all confidential and trade secret information in their possession when their employment ends. (*See* Ex. E.)

**ANSWER:**  Admitted.

28.    The Confidentiality Agreement provides additional measures to protect Enlitic's confidential information:

- "At all times during and after Employee's employment, Employee will hold in confidence and will not disclose [or] use . . . any of the Company's Confidential Information[2] . . ." (*Id.* at 1.)

- Employees must "keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by Employee and all Company Inventions made by Employee during the period of Employee's employment at Company, which records will be available to and will always remain the sole property of Company." (*Id.* at 2.)

- Employees are prohibited from "directly or indirectly engaging in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, Employee's employment with the Company." (*Id.* at 3.)

- Employees concede and agree "that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement." (*Id.* at 4.)

- Employees must agree to inform Enlitic, for a period of one year following the end of their employment, of "all employment and business ventures which Employee enters." (*Id.* at 4.)

**ANSWER:**  Admitted.

---

[2] "Confidential Information" is defined in the Confidentiality Agreement to include "trade secrets, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology." (Ex. E at 1).

69409961;3

29.     Enlitic maintains additional confidentiality policies within the Enlitic Employee Handbook ("Employee Handbook", Ex. B). Among other protective policies, the Employee Handbook states:

- Software programs purchased and provided by Enlitic are to be used only for creating, researching, and processing materials for Company use." (*Id*. at 19.)

- Employees "may not illegally duplicate any licensed software or related documentation." (*Id*.)

- Employees' "[p]ersonal devices may not be used to connect to other Enlitic networks or resources without authorization from IT." (*Id*. at 20.)

- Employees leaving work are instructed to "lock all desks, lockers, and doors protecting valuable or sensitive material in your work area and report any lost or stolen keys, passes, or similar devices to your Manager immediately." (*Id*. at 21.)

- Employees must "[r]efrain from discussing specifics regarding Enlitic security systems, alarms, passwords, etc. with those outside of Enlitic." (*Id*.)

- Employees are instructed to follow Enlitic's "Access Control and minimum necessary policies," under which employees can access programs and information only when authorized to do so. (*Id*.)

**ANSWER:** Admitted.

30.     To ensure its employees understand and respect these policies, Enlitic also requires employees to review and sign the Employee Handbook and undergo training on protecting the Company's confidential and trade secret information. (Lennartson Decl. ¶¶ 10, 12.)

**ANSWER:** Denied.

31.     Enlitic also uses physical and data security measures to protect its confidential and trade secret information. The Company restricts access to its facilities and uses passwords, encryption, multi-level authentication, and access restrictions to protect its data. (*Id*. at ¶ 14.)

**ANSWER:**  Conyers admits that the Fort Collins office of Enlitic protects it confidential information and trade secrets.  Otherwise, denied.

32.     When an employee leaves the Company, Enlitic employs additional precautions to prevent misappropriation, including reminding the terminated employee of their continuing confidentiality obligations and requesting the immediate return of any confidential material. (*Id.* at ¶ 13.)

**ANSWER:**  Admitted.

**C.     Conyers Accepts Employment as Enlitic's CEO and Agrees to Protect Enlitic's Trade Secrets.**

33.     On May 3, 2021, Conyers joined Enlitic as the Company's Chief Operating Officer. (Sistenich Decl. ¶ 13; Lennartson Decl. ¶ 16.)

**ANSWER:**  Admitted.

34.     On April 25, 2021, Conyers signed the Confidentiality Agreement as a condition to his employment. (Lennartson Decl. ¶ 17.)

**ANSWER:**  Admitted.

35.     On March 8, 2022, Conyers executed a revised version of the Confidentiality Agreement, which contains all of the provisions listed above in paragraph 28. (Ex. E, Lennartson Decl. ¶ 18.) In the revised Confidentiality Agreement, Conyers acknowledged the proprietary and confidential nature of the information to which he would become privy and help develop and covenanted not to use or disclose such information except as expressly authorized by and for the benefit of Enlitic. (Ex. E at 1.)

**ANSWER:**  Denied.

36.     Furthermore, Conyers agreed that the Confidentiality Agreement "does not prevent Employee from earning a living or pursuing Employee's career" and that "the restrictions contained

-11-

69409961;3

in [the Confidentiality Agreement] are reasonable, proper, and necessitated by Company's legitimate business interests." (*Id*. at 3.)

**ANSWER:**  Admitted as to the original Confidentiality Agreement.  Otherwise, denied.

37.    As an Enlitic employee, Conyers was also required to review and sign the Employee Handbook and take part in Employee confidentiality training. (Lennartson Decl. ¶ 19.) Therefore, Conyers was expressly aware that Company policy stated that employee's "[p]ersonal devices may not be used to connect to other Enlitic networks or resources without authorization from IT," and that employees were prohibited from "illegally duplicat[ing] any licensed software or related documentation." (Ex. B at 19-20.)

**ANSWER:**  Denied.

38.    In November 2021, Conyers was promoted to Enlitic's Chief Executive Officer. (Sistenich Decl. ¶ 16.) As CEO, Conyers was responsible for overseeing all Company operations, including product research and development, corporate partnerships, sales, personnel development, human resources, and legal compliance. (*Id.* at ¶ 17.)

**ANSWER:**  Admitted.

39.    During his tenure as CEO, Conyers was provided access to Enlitic's confidential and trade secret information, including the source code and the full range of Enlitic Curie™ products. (*Id.* at ¶ 18.) Conyers had the highest level of security clearance for confidential and proprietary data and had full access to the Company's critical, highly sensitive information. (Bonney Decl. ¶ 8.)

**ANSWER:**  Admitted.

40.    However, although Conyers has a Master of Business Administration in Management Information Systems, as well as a bachelor's degree in Computer Information Systems, he had no further formal or professional training, education, or background in coding,

data engineering, computer science, or artificial intelligence development. At no time did Conyers possess the ability to directly manipulate the Enlitic source code without the help of other employees who were trained professionals in their respective fields. (Sistenich Decl. ¶ 20.)

**ANSWER:**  Denied.

41.     Conyers would not typically perform any of his duties directly with the employees researching and developing Enlitic's source code, and therefore there was no legitimate business reason for him to collect the source code from the Company's servers, even if just to move files to a secondary location. (*Id.*)

**ANSWER:**  Denied.

**D.     Conyers Stole Enlitic's Trade Secret Information and Planned to Compete While Still Serving as CEO.**

42.     Conyers' disloyal activity began months before his employment was terminated for cause in February 2023. As early as October 2022, Conyers was plotting to steal Company information and use it to develop his own competing business.

**ANSWER:**  Denied.

43.     Enlitic's Chief of Staff, Thea Moeller, served as Conyers' executive assistant from the time of his hiring until his termination. From later 2022 until his employment was terminated, Ms. Moeller witnessed Conyers engage in a series of increasingly suspicious behaviors. (Moeller Decl. ¶ 1, 3-26.)

**ANSWER:**  Admitted that Moeller served as Conyers' executive assistant. Otherwise, denied.

44.     The Company first learned of these behaviors when Ms. Moeller came forward in late February 2023 to report Conyers' activity. More specifically, Moeller witnessed or came to learn of the following:

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

> **i.   Conyers plans to use Enlitic technology to start a new company.**

45.     On or around October 2, 2022, while the two of them were attending a work conference, Conyers appeared concerned that an ongoing leadership restructuring at Enlitic might impact his role at the Company. Conyers' worries were exacerbated when Enlitic's planned Series C funding round fell though. Conyers told Ms. Moeller that he intended to leave Enlitic. At that time, Ms. Moeller believed Conyers was only complaining, and Conyers did not mention competing with Enlitic. (*Id.* at ¶ 2.)

**ANSWER:**  Admitted that they attended a work conference.  Otherwise, denied.

46.     Between October 2 and 18, 2023, Conyers appeared to grow increasingly concerned with the corporate restructuring. During this time, Conyers discussed with Ms. Moeller the likelihood that both he and she would lose their jobs. Conyers told Ms. Moeller that, if fired from Enlitic, he would start his own competing business using the Curie|ENCODE™ tool, Enlitic's proprietary billing and coding technology. (*Id.* at ¶¶ 4.)

**ANSWER:**  Denied.

> **i.   Conyers asks his assistant to purchase a secret laptop to help start his competing company.**

47.     On October 18, 2022, Conyers texted Ms. Moeller that he was "done with Enlitic." (*Id.* at ¶ 5.)

**ANSWER:**  Denied.

48.     That day, Conyers instructed Ms. Moeller to use Company funds to purchase an Apple MacBook Pro with certain hardware specifications with Enlitic's Apple credits, which he did not believe could be tracked.[3] (*Id.*)

**ANSWER:** Denied.

49.     Conyers told Ms. Moeller that he would use the laptop to start a business that would compete with Enlitic, which he named "Reactic." (*Id.*)

**ANSWER:** Denied.

50.     Ms. Moeller delivered the computer, Serial No. T9M6RNP4NW, to Conyers on November 18, 2022. (*Id.*)

**ANSWER:** Admitted.

### i.   **Conyers drafts a business plan and creates a website for his competing company while still Enlitic's CEO.**

51.     After the termination of Conyers' employment, the Company recovered his personal spiral notebook, which he had left in his office (Moeller Decl. ¶ 22.) Conyers asked that Enlitic return this notebook to him, but requested that only Ms. Moeller be permitted to review the notebook. (*Id.*)

**ANSWER:**     Admitted that he handed the notebook the VP of Human Resources. Otherwise, denied.

52.     Several pages of the notebook contain what appear to be plans for Conyers to compete with Enlitic. (*Id.* at ¶ 23-24.) For example, one page lists a number of potential company names very similar to Reactic, the name Conyers told Ms. Moeller he would call his competing

---

[3]  On October 11, 2023, Conyers sent Ms. Moeller a receipt for a separate laptop purchased outside the normal procurement channels for Paul Kelly, a former Enlitic employee whose employment was terminated for cause on January 5, 2023. (Moeller Decl. ¶ 6.) Conyers instructed Ms. Moeller to expense the purchase to the Company. (*Id.*) The purpose for this off-the-books purchase, and whether Mr. Kelly is connected to Conyers' wrongdoing, is unclear. However, Mr. Kelly has not returned this computer to the Company despite repeated requests for its return.

business. The list included, among others: "reactive AI," "rethink AI," "Lively AI," "mindful AI," and "reaktus." (*Id*. at ¶ 24.)

>    **ANSWER**:  Denied.

53.     The notebook also contained a checklist of tasks Conyers needed to accomplish to start his new business. (*Id*. at ¶ 23.) These tasks included registering an LLC, registering a domain name (this task was crossed off), developing a website, creating a funding plan, retaining an advisor, developing a contact and relationship plan, creating a pitch deck, and other tasks. (*Id*.)

>    **ANSWER**:  Denied.

54.     An internet search reveals that the domain name "reacticai.com" was registered on October 22, 2022.[4]

>    **ANSWER**:  Admitted.

55.     The "reacticai.com" website is currently viewable on the internet today.[5]

>    **ANSWER**:  Admitted.

56.     The website states that Reactic AI is "dedicated to the development of advanced AI technologies that directly impact the clinical workflow" and advertises that it aims to solve for lost revenue due to healthcare billing and coding errors.

>    **ANSWER**:  Admitted.

57.     Forensic investigation of Conyers' work laptop shows that, by November 11, 2022, he created an email account for "jim@reacticai.com." (Walton Decl. ¶ 12.)

>    **ANSWER**:   Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

---

[4]  *See* https://www.whatsmydns.net/domain-age?q=reacticai.com.
[5]  *See* https://reacticai.com.

58.     Further, on January 9, 2023, Conyers used the same work laptop to visit Reactic AI's website. (*Id.*)

**ANSWER:**  Admitted.

59.     Reactic AI's business is remarkably similar to that of Enlitic and specifically purports to solve a market need addressed by Curie|ENCODE™, the very same program Conyers told Ms. Moeller he would use to build his new business.

**ANSWER:**  Denied.

> **i.   Conyers secretly connected an external hard drive to the Enlitic servers without approval from IT.**

60.     On January 1 and 2, 2022, Ms. Moeller and Conyers were alone in the Enlitic offices during a holiday weekend to catch up on tasks. One of those days, Conyers entered Ms. Moeller's office with an external hard drive she had never seen before. Conyers said something to the effect of, "This thing isn't working in my office can I try plugging it in here?" Moeller allowed him to do so. (Moeller Decl. ¶ 9.) Later that day, Conyers returned to the office and collected the external hard drive. (*Id.*)

**ANSWER:**  Conyers admits that he was in the office on January 1 and 2, 2022.  Otherwise, denied.

61.     On February 24, 2023, the day Conyers' employment was terminated, he called Ms. Moeller and asked her to collect his external hard drive from the from Enlitic office and bring it to him, stating that the hard drive had only "personal information." (*Id.* at ¶ 22.) Ms. Moeller referred the request to Company IT. (*Id.* at ¶ 26.)

**ANSWER:**  Denied.

-17-

62.     On February 25, 2023, Enlitic IT personnel discovered the device hidden under a former employee's abandoned desk, powered on with an active network connection, that had been running continuously since December 22, 2023. (Bonney Decl. ¶ 26.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

63.     On February 27, 2023, Enlitic investigated the network history of the hard drive and discovered about 790 MB of network activity over the previous 30 days, with the majority of that activity occurring on February 1 and 2, 2023. (*Id*. at ¶ 32.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

64.     Conyers intentionally and improperly connected the external hard drive to the Company's servers to store the Company's trade secret information, and intended to use that information to build a competing business.

**ANSWER:**  Denied.

65.     Enlitic has since employed a third-party forensic investigator, who is currently examining the external hard drive to determine its contents. (Walton Decl. at ¶ 10.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

> **i.    Conyers downloads a large numbers of Company files and deletes them shortly afterwards under false pretenses.**

66.     On January 10, 2023, Ms. Moeller received an automatically generated email from SharePoint noting that Conyers had recently deleted a "large number of files" from his OneDrive document file account. (Moeller Decl. ¶ 10.)

**ANSWER:** Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

67.     Ms. Moeller, concerned that files had been accidentally deleted, asked Conyers if he deleted the files intentionally. (*Id*.) Conyers initially denied deleting any files. (*Id*. at ¶ 11.)

**ANSWER:** Admitted.

68.     However, when Company IT confirmed that files had been deleted from the account, Ms. Moeller asked Conyers again if he had deleted the files. This time, Conyers conceded that he had deleted a large number of files from his SharePoint account but stated that he did so at the request of Mike Sistenich, the Chairman of Enlitic's board of directors. (*Id*. at ¶ 11-12.)

**ANSWER:** Denied.

69.     Contrary to Conyers' representations, Sistenich never instructed Conyers to delete any documents. (Sistenich Decl. ¶ 21.) Further, while Conyers did occasionally send Sistenich documents and updates over SharePoint, he did not receive any large file share from Conyers on January 10. (*Id*.)

**ANSWER:** Conyers admits that Sistenich never instructed Conyers to delete documents. Otherwise, denied.

70.     After Conyers' employment was terminated on February 24, he expressed to Ms. Moeller that although he did not know why he was fired, he hoped that it did not have anything to do with the documents he deleted from SharePoint on January 10. (Moeller Decl. ¶ 12.)

**ANSWER:** Denied.

     **i.**   **Conyers takes an unplanned international "business" trip.**

71.     On January 25, having already secretly downloaded hundreds of files containing Enlitic's confidential information in the preceding months, Conyers asked Ms. Moeller to book him a flight to Poland on February 11-15, 2023, purportedly for a business meeting. (Moeller Decl.

¶ 13.) Conyers stated that the purpose of this trip was to meet with representatives of Digica, a potential contractor competing for business in an ongoing Enlitic initiative. (*Id*.)

**ANSWER**: Denied.

72. Ms. Moeller was confused by Conyers' stated reason for trip. Meetings with contractors were regularly taken over Zoom and Conyers had never before travelled to meet contractors, especially internationally. (*Id*. at ¶ 16.) Also, the trip cost nearly $10,000, and thus was incredibly expensive during a time when the Company had only recently secured additional financing. (*Id*.)

**ANSWER**: Denied.

73. Most concerning though, Conyers would not confirm that any meeting with Digica was actually scheduled. (*Id*. at ¶ 17.) Between January 25 and February 9, Ms. Moeller repeatedly asked Conyers if a meeting was confirmed with Digica, but Conyers would not give Ms. Moeller a clear answer. (*Id*.) Digica also had not reached out to Ms. Moeller to plan or schedule any meeting in Poland. (*Id*.)

**ANSWER**: Denied.

74. On February 9, 2023, concerned something was amiss, Ms. Moeller independently reached out to Digica's representative to confirm a meeting with Conyers in Poland. (*Id*. at ¶ 18.) The representative from Digica was shocked to hear about a meeting in Poland—they had no prior knowledge of any meeting with Conyers. (*Id*.)

**ANSWER**: Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

75. In fact, Digica's representative was not even in Poland. While Digica is based in Poland, Digica's representative for Enlitic lives in San Francisco, a fact Conyers was aware of since they met in California only a few months prior. (*Id*.)

**ANSWER:** Conyers admits that the CEO of Digica resides in San Francisco. Otherwise, denied.

76.     When Ms. Moeller asked Conyers about the inconsistency, Conyers appeared frazzled and insisted that there was a misunderstanding and that Digica "should have known" about the meeting. (*Id*. at ¶ 20.) Nonetheless, Conyers insisted on taking the flight to Poland on February 11-15, 2023, and he asked the Digica representative to fly from San Francisco to meet him there. (*Id*. at 19-20)

**ANSWER:** Denied.

77.     It is impossible without discovery to determine Conyers' true motives for the flight to Poland, but the trip was unplanned, expensive, unnecessary, and outside standard procedures. Additionally, the timing of the flights—two days after Conyers transferred and deleted enough files to trigger a protective system update—supports a reasonable belief that Conyers had ulterior motives for the trip and was preparing to transfer, or did transfer, Enlitic confidential information and trade secrets to a third-party.

**ANSWER:** Denied.

> **i.    Conyers specifically instructs Company IT to wipe his company laptop's memory without backing it up.**

78.     On February 23, one day before being informed of his termination, Conyers had a call with Enlitic's IT personnel. At the beginning of the call, Conyers asked IT to wipe his primary registered Company laptop (SN R913HKC3) without backing up the hard drive data. (Bonney Decl. ¶ 21.) This is the same laptop Conyers used to visit Reactic AI's website just one month prior. (Walton Decl. ¶¶ 11-12.) Later forensic investigation of this laptop would reveal the extent to which Conyers downloaded Enlitic's confidential files. (*Id*.)

**ANSWER:** Denied.

79.     Enlitic's IT department found the request highly unusual, as it is standard Company policy to backup hard drive data before a full deletion. (Bonney Decl. ¶ 21.) However, Conyers failed drop off the laptop that day to IT. (*Id.*)

**ANSWER:**  Denied.

80.     Instead, IT personnel confiscated the laptop when Conyers' employment was terminated the next day. (*Id*. at ¶ 22.) Upon collection, IT connected the laptop to a charger and disconnected it from the internet to preserve the data contents.

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

81.     The laptop is currently with the third-party forensic investigator, who is examining its contents. (Walton Decl. ¶ 11.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

### E.     Forensic Investigation Reveals that Conyers Misappropriated Thousands of Enlitic's Confidential Files.

82.     Things moved quickly once Ms. Moeller reported Conyers' behavior to senior Company management. On February 23, Enlitic instructed the IT department to create a backup of Conyers' Outlook mailbox as a PST file and to synch Conyers' OneDrive to a local directory. (Bonney Decl. ¶ 24.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

83.     On February 24, 2023, Enlitic terminated Conyers' employment for cause. Upon termination, Enlitic reminded Conyers of his obligations under the Confidentiality Agreement and requested that he return any and all information or materials pertaining to Enlitic's business.

(Lennartson Decl. ¶ 24.) Conyers represented to Enlitic, in writing, that he understood these continuing obligations and that he returned all Enlitic property and information. (*Id*. at ¶ 25.)

    **ANSWER:**  Admitted.

    84.    That day, Enlitic IT immediately suspended all of Conyers' known Company accounts, including for Microsoft 365, GitHub, Dropbox, Box.com, Notion, Zoom, Google Workspace, and others. (Bonney Decl. ¶ 24.) IT also immediately collected Conyers' computer for analysis, including the one Conyers' had asked IT to wipe without a backup. (*Id*. at ¶ 22.) Enlitic engaged counsel and hired a third-party forensic expert to analyze Enlitic's systems in an effort to investigate those actions and determine the extent of the Company's possible risk exposure. (Lennartson Decl. ¶ 23.)

    **ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

    85.    On February 27, 2023 Enlitic IT examined the network history of the secret external hard drive that Conyers had hidden within the office and found over 790MB of network activity over prior 30 days, with the majority taking place of on February 1 and 2. (Bonney Decl. ¶ 32.) Enlitic IT also restored 1,500 files that had been deleted from Conyers' personal Dropbox account and 600 files that had been deleted in Conyers' OneDrive account. (*Id.* at ¶¶ 29-30.)

    **ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

    86.    The Company identified a pattern of activity wherein Conyers would repeatedly upload files to SharePoint and Dropbox and then delete them 15-20 minutes later. (*Id.* at ¶ 29.)

    **ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

87.     On February 28, 2023, Enlitic discovered that on January 2, 2023, Conyers had accessed GitHub and downloaded the source code repository for Curie|ENDEX™, Enlitic's proprietary tool for AI for medical imaging. (*Id*. at ¶ 31.) That same day, Conyers uploaded the product source code repository for Curie|ENCOG™, Enlitic's medical record analytics and anonymization tool. (*Id*. at ¶ 34.)

**ANSWER:** Denied.

88.     Enlitic IT generated an activity report for Conyers. (Sistenich Decl. ¶ 22.) The report, reviewed by senior management of the Company, indicates that Conyers transferred thousands of files containing confidential material over the course of the four months prior to his termination. These files included confidential and proprietary source code, data repositories, CPT code tables, and AI application graphics. (*Id*. at ¶¶ 24-25.)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

89.     The activity report indicates that, for example, the following files containing confidential code were accessed via GitHub, none of which Conyers had any legitimate business reason to download and transfer in the final months of his tenure:

- CPT Code Table

- Curie (the code file for Enlitic Curie™)

- Enlitic_Anonymizer (the code file for Curie|ENCOG™)

- Model-standardize (the code file for Curie|ENDEX™)

**ANSWER:**  Conyers lacks sufficient information to admit or deny the allegation and therefore denies it.

90.     Beyond his degrees in Management and Computer Information Systems, Conyers had no formal or professional training, education, or background in coding, data engineering,

computer science, or artificial intelligence development. (Sistenich Decl. ¶ 20.) At no time did Conyers possess the ability to directly manipulate the Enlitic source code for any legitimate business purpose without the help of other employees who were trained professionals in their respective fields. (*Id*.) Furthermore, a CEO would not typically perform any of his duties directly with the employees researching and developing Enlitic's source code. (*Id*.)

**ANSWER:** Denied.

91.    There was no legitimate business reason for the Conyers to collect source code from the Company's servers, even if just to move files to a secondary location. (*Id*.) The only reasonable inference to be drawn from his actions is that Conyers intentionally transferred the data with the intent to misappropriate Enlitic's trade secrets.

**ANSWER:** Denied.

**F.    Conyers Fails to Substantively Respond to Enlitic's Demand Letter.**

92.    On March 3, 2023, Enlitic's counsel delivered by email and courier a letter informing Conyers of his illegal behavior and demanding that he cease and desist. ("Demand Letter", Ex. C.)

**ANSWER:** Admitted.

93.    Specifically, the Company demanded that Conyers:

i.    **Cease and Desist Using Company Confidential Information**: You must expressly confirm that you have ceased and desisted from using any and all Enlitic Confidential Information in any manner whatsoever. This includes, but is not limited to, any of the Standardize source code discussed *infra*. This also includes information regarding customers and potential customers of the Company.

ii.    **Return Company Property**: Return all Company Property to Enlitic and certify in writing that you no longer retain any Company Property. This includes, but is not limited to:

a.    **Source Code**: Enlitic has evidence that, in the week prior to your termination, you deleted approximately 1,500 files potentially containing Enlitic's

-25-

Confidential Information from your Dropbox account. Among the files you deleted was source code for Standardize, which you downloaded from GitHub.

The Company also has evidence that you added many other files to your Dropbox account and then deleted them a short time later. This pattern of behavior is troubling and suggests that you violated several legal and contractual duties to the Company.

(1) You must return all Confidential Information (including source code) that you have within your possession, custody, or control.

(2) You must explain in writing whether you transferred Enlitic Confidential Information, including source code, to any third party, and if so, identify those third parties and cooperate with Enlitic's efforts to recover that information.

(3) You must explain in writing for what purpose you uploaded source code and other Confidential Information to Dropbox, and cooperate with any forensic investigation related thereto.

b. **Computing Devices**: Enlitic has learned that you purchased computing devices outside of the Company's normal procurement processes, including the MacBook Pro referenced below. You must return all computing devices and electronic storage devices to Enlitic and make your personal computing devices available for forensic inspection.

(1) **MacBook Pro Serial No.: T9M6RNP4NW**. All computing devices and electronic storage devices must be returned unaltered with no data deleted, and you must cooperate with any forensic investigation related to your use of those devices.

c. **Return Other Company Property**: You must return any and all other Company Property in your possession, including electronic computing or storage devices, and any electronic or hard copy documents, communications, or things that contain Enlitic Confidential Information, such as strategic plans, financial information, and customer information.

iii. **Cease and Desist Solicitation of Employees, Consultants or Contractors**: You must not contact, communicate with, or solicit any Enlitic employee, consultant, or contractor for a period of 12 months (other than communicating with Ryan Lennartson regarding the issues raised in this letter). This includes the Company's outside contractors, such as Kal Clark, Corey Schmid, and Jeremy Bikman. Enlitic has instructed its employees not to communicate with you.

iv. **Explain Apparent Breaches of Your Duty of Loyalty**: During your employment, the Agreement prohibited you from directly or indirectly engaging in any employment or business activity which was directly or indirectly competitive with Enlitic's business. The Agreement also requires you to inform the Company of "all

69409961;3

employment and business ventures" you enter within one year after your employment ends. To that end:

a.  You must provide written explanation of the purpose for your recent trip to Poland.

b.  You must provide written explanation of your involvement with ReacticAI, or any other prospective company or entity you intend to join or establish.

**ANSWER:**  Admitted.

94.  The Company gave Conyers a deadline of Sunday, March 5, 2023, at 5:00 p.m. Mountain Time, to address each of the points in the Demand Letter. (*Id*.)

**ANSWER:**  Admitted.

95.  Conyers responded on Sunday, March 5, with a written letter titled "Conyers – Enlitic Response" ("Response Letter", Ex. D).

**ANSWER:**  Admitted.

96.  The Response Letter failed to provide any evidence-based, legitimate explanations for Conyers' actions. For example, Conyers concedes that he created Reactic AI and launched the Reactic AI website, but he claims that "Reacitic AI is not a business it is a website playground." The Response Letter was a dilatory attempt to mislead Enlitic, to feign compliance, and to cover-up Conyers' trade secret misappropriation.

**ANSWER:**  Denied.

97.  This not the first time Conyers has stolen his former employer's trade secrets and claimed innocence. In 2020, the Eastern District of Virginia issued a Temporary Restraining Order and Preliminary Injunction against Conyers in favor of his former employer after finding that Conyers copied and retained his employer's confidential information even after resigning. *Apollo Enter. Imaging Corp. v. Conyers*, No. 119-CV-1603-LMB/MSN, 2020 WL 1896706, at \*2 (E.D. Va. Jan. 10, 2020). In granting the TRO, the judge in *Apollo* found that "over a period of several

months, including immediately before resigning from Apollo, Conyers copied Apollo's confidential, proprietary information . . . ." *Id*. at *2. Critically here too, the judge found that "Conyers withheld such information from Apollo even when he claimed to have returned everything in his possession on the Thumb Drive, which contained only a handful of files as compared to the vast amounts of information he had copied from Apollo's systems." *Id*.

**ANSWER**: Conyers admits that this allegation recites the Judge's opinion.  Otherwise, denied.

98.    Like Conyers' former employer in *Apollo*, Enlitic cannot afford to take Conyers' word that he has not stolen Enlitic's trade secret information when both eyewitness and forensic evidence both overwhelmingly show that he has.

**ANSWER**: Denied.

99.    The facts of this case, taken together, support an inference that Conyers has intentionally and flagrantly stolen Enlitic's proprietary trade secrets to use them to his own benefit. Conyers anticipated his termination, used Company funds to purchase hardware to compete with the Company, secretly logged into the Company's systems with an external hard drive, engaged in suspicious international travel under false pretenses, and, most importantly, downloaded and exported Enlitic's proprietary data—including its foundational source code—to an unknown location.

**ANSWER**: Denied.

100.    Conyers' abuse of his executive position and disregard for his contractual and fiduciary duties presents Enlitic with an existential threat.

**ANSWER**: Denied.

## COUNT I: BREACH OF CONTRACT

101.    Enlitic incorporates by references the allegations in the preceding paragraphs as if set forth fully herein.

**ANSWER:**  Conyers incorporates his responses to the previous allegations.

102.    The Confidentiality Agreement is a valid, binding, and enforceable written agreement.

**ANSWER:**  This allegation recites a legal conclusion and requires no answer.

103.    The Confidentiality Agreement, which Conyers executed as a condition to his employment with Enlitic, was supported by consideration. The Confidentiality Agreement is reasonable in duration and scope, and is designed to advance a legitimate interest of Enlitic.

**ANSWER:**  This allegation recites a legal conclusion and requires no answer.

104.    Conyers violated the Confidentiality Agreement in numerous ways, including by:

    **i.** Conyers expensed a laptop computer with Company money that he then connected to Enlitic's network. As such, Conyers was expected to comply with Enlitic's policies protecting confidential and proprietary information. Company policy states personal devices are not allowed to view, edit, or distribute any confidential and proprietary with any party inside or outside Enlitic. Conyers viewed confidential and proprietary Company information on the expensed, unprotected laptop in violation of company policy.

    **ii.** Conyers jeopardized the security of Enlitic's confidential and proprietary information by connecting an unauthorized network attached storage device ("NAS device") to the Company's network from an unassigned desk at Enlitic's offices in Fort Collins, CO. The NAS device is subject to the Company's policies on devices

and data protection. As stated above, reviewing, editing, or distributing any confidential and proprietary information on a personal device is prohibited.

iii. Conyers has likely kept confidential and proprietary information after his termination that is the rightful property of Enlitic. The Confidentiality Agreement and Employee Handbook state Company property cannot be kept on any device by an individual who has not been authorized to do so. Conyers' employment was terminated by Enlitic and retains no express authorizations from the Company to keep any of the Company's confidential and proprietary information post-termination.

**ANSWER:** Denied.

105.    Most importantly, Conyers plotted and took active steps to compete against Enlitic by establishing Reactic AI using Enlitic's proprietary trade secret source code.

**ANSWER:** Denied.

106.    Thus, Conyers is in breach due to: (i) misappropriation of Enlitic's Confidential Information, (ii) solicitation of Enlitic employees, (iii) failure to return Company property, and (iv) preparation to compete with Enlitic while still employed by the Company.

**ANSWER:** Denied.

107.    Enlitic will suffer immediate, immeasurable, and irreparable harm to its market share, customer relationships, supplier relationships, trade secrets, and goodwill, unless Conyers is enjoined from continuing to violate the Confidentiality Agreement, including such provisions on maintaining Enlitic's confidential information, prohibiting the reveal of that information to third parties, and using the information post-employment and/or to compete with Enlitic.

**ANSWER:** Denied.

108.    As expressly agreed by Conyers in the Agreement, Enlitic has no adequate remedy at law.

**ANSWER:**  Denied.

109.    As a result of Conyers' breaches, Enlitic has and continues to sustain damages in an amount to be proven at trial.

**ANSWER:**  Denied.

## COUNT II: VIOLATION OF THE DEFEND TRADE SECRETS ACT

110.    Enlitic incorporates by references the allegations in the preceding paragraphs as if set forth fully herein.

**ANSWER:**  Conyers incorporates his responses to the previous allegations.

111.    Enlitic has a variety of trade secret information including technical and non-technical data, formulas, compilations, programs, plans, devices, methods, techniques, financial data and plans, product plans, and lists of actual or potential customers or suppliers. Conyers acknowledged this information to be protected trade secrets in the Confidentiality Agreement he signed with Enlitic.

**ANSWER:**  This allegation recites a legal conclusion and requires no answer.

112.    Enlitic took reasonable steps to protect the confidentiality of its trade secrets. As explained above, Enlitic executed Confidentiality Agreements with all key employees, distributors, suppliers, consultants, and anyone with access to Enlitic's proprietary information. Moreover, Enlitic's Employee Handbook laid out additional information security policies on which all employees were instructed and by which they were required to abide.

**ANSWER:** This allegation recites a legal conclusion and requires no answer.

113.    Enlitic's Confidential Information is defined in the Confidentiality Agreement to be intentionally broad, and any information taken by Conyers falling within that definition must be returned. However, the primary trade secret technology at risk in this case includes:

- Enlitic|Curie™, an AI database and evidence platform that allows implementation of Enlitic application modules or third-party AI algorithms;

- Curie|ENDEX™, an application that uses AI for medical imaging;

- Curie|ENCOG™, an AI tool for medical record review and anonymization;

- Curie|ENCODE™, a healthcare billing and coding tool;

- Enlitic's supply chain, customer relationships, pricing, and contractor and customer agreements;

- Details about the functionality and capabilities of Enlitic's product lines; and

- Details about the relationships between Enlitic, its customers, and partners, including details surrounding contract negotiations.

**ANSWER:** This allegation recites a legal conclusion and requires no answer.

114.    Conyers acknowledged he would have access to these trade secrets in the Confidentiality Agreement he signed with Enlitic. Moreover, as Enlitic's CEO, Conyers was involved in every aspect of the business for the past two years. No one at Enlitic is more knowledgeable of the company's confidential information than Conyers.

**ANSWER:**  Denied.

115.    The confidential coding information Conyers syphoned from Enlitic's servers account are trade secrets, and this case meets all requirements for relief under the Defend Trade Secrets Act ("DTSA"). 18 U.S.C. § 1832 *et seq*. This information derives economic value for Enlitic and is not generally known outside of the company. Additionally, Enlitic took steps to

maintain the secrecy of its information, including marking information as confidential, and did not delay in taking protective measures upon becoming aware of Conyers' theft. *Id.*

**ANSWER:** This allegation recites a legal conclusion and requires no answer.

116.    Moreover, given Conyers' history of deception regarding this and similar matters, if Conyers were given notice of Enlitic's application for relief, it is highly likely that he would make additional copies of Enlitic's trade secrets and destroy or hide the devices Enlitic currently knows about.

**ANSWER:**  Denied.

117.    The harm to Enlitic if it is not granted injunctive relief wholly outweighs the harm to any legitimate interest of Conyers. Conyers has no legitimate need or interest for any Enlitic trade secret information, and the cost of Conyers' compliance is little compared to the millions of dollars the trade secrets represent. Accordingly, Enlitic seeks immediate declaratory and injunctive relief to retrieve stolen trade secret information and to prevent Conyers from committing any future and further violations.

**ANSWER:**  Denied.

118. Enlitic also seeks damages for any loss or unjust enrichment caused by the misappropriation, including attorneys' fees and exemplary damages.

**ANSWER:**  Denied.

**PRAYER FOR RELIEF**

The Prayer for Relief contains no allegations and therefore requires no answers.

**AFFIRMATIVE DEFENSES**

1.  The complaint fails to state a cause of action upon which relief may be granted

2.  Failure to mitigate damages

-33-

3.  No damages

4.  Unclean hands

5.  Preemption

## COUNTERCLAIM

Counterclaim Plaintiff James Michael Conyers ("Conyers" or "Counterclaim Plaintiff") files his Counterclaim against Counterclaim Defendant Enlitic, Inc. ("Enlitic" or "Counterclaim Defendant").

## PARTIES

1.      Conyers is an individual residing at 736 San Felipe Drive, Fort Collins, CO 80524.

2.      Enlitic is a Delaware Corporation with its principal place of business at 3420 East Harmony Road, Suite 125, Fort Collins, CO 80528.

## JURISDICTION AND VENUE

3.      The Court has supplemental jurisdiction over Enlitic pursuant to Title 28 U.S.C. §1367.

4.      The Court has personal jurisdiction over Enlitic because it conducts business in this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(3) because Enlitic is subject to this Court's personal jurisdiction.

## BACKGROUND FACTS

6.      On May 3, 2021, Conyers joined Enlitic as the Company's Chief Operating Officer.

7.      In November, 2021, Conyers was promoted to be Enlitic's Chief Executive Officer.

8.      While serving as COO and CEO, Conyers was involved with various securities offerings being made by Enlitic.

-34-

9.     During the course of these offerings, Conyers was instructed by Michael Sistenich not to disclose certain information to investors.

10.     Conyers questioned those instructions and was accused of "not being a team player."  He would often disagree and flat out say no or he did not want anything to do with it or that he would not do it.

11.     One of the pieces of information Conyers was order not to disclose to investors during the current Funding Round that started in August 2022, was in full funding mode by October, 2022 and closing during the first part of February, 2023 was that Enlitic was planning to terminate its Chief Technical Officer Dan Kozimor and Chief Science Officer and former Chief Executive Officer Kevin Layman.

12.     Disclosing this information to investors, given the sensitive nature of this round would have caused concern, more questions, and would negatively impact the success of the round and cause a potential delay of closing given that the company would be cash out around February 18, 2023.

13.     Sistenich asked Conyers in December, 2022 while at the Radiology Society of North American (RSNA) trade show if Conyers would join him in trying to buy out Capitol Radiology Shares, Enlitic's largest share holder.

14.     When Conyers asked about filing the proper disclosures, Sistenich said we would not, and that he would have his mother,  connections  in China, or a third party family party to buy the shares.

15.     Conyers rejected the offer and stated that it was not legal.

16.     On February 7, 2023, Sistenich called Conyers around 8:00 MST.  Sistenich was excited to tell Conyers that Justin Walter, a board member of Enlitic, representing Enlitic's largest shareholder, would be stepping down from the Board.

17.     Sistenich said that Walter had informed him that he would be stepping down from the Board and that Capitol Health would be putting out a statement the following day announcing that they would be decreasing their carry value in Enlitic and that Walter would be stepping down from the Board.

18.     Sistenich continued to tell Conyers that Walter had told him that Capitol Health would be interested in a potential buyer.

19.     Conyers asked if the proper disclosures would be followed.  Sistenich said no, that it would create questions and potentially impact the round.

20.     Sistenich got angry and said that Conyers was not a team player and not willing to invest in Enlitic.  Conyers said that he did not want to do something that is unethical and potentially illegal.

21.     During the development of the Fast and Furious Release, it was found that Enlitic had another Patient Health Information (PHI) breach identified.  The former CTO Dan Kozimor brought this up on a leadership call.  Sistenich said let's take that off line.

22.     There was a previous PHI breach with Capitol's data just after Conyers became CEO.  Conyers said that it had to be reported and Capitol notified.

23.     Sistenich told Conyers to keep his mouth shut or else, that it would kill the round and cause concern to Capitol.

24.     Conyers was terminated on February 24, 2023, and sued by Enlitic on March 8, 2023.

**COUNT I (Claim for Wrongful Discharge in Violation of Public Policy)**

20.     Conyers restates and incorporates paragraphs 1 through 19 as if fully restated herein.

21.     Enlitic directed Conyers to perform  illegal acts as part of his work related duties.

22.     The actions directed by Enlitic violated a statute or clearly expressed public policy.

23.     Conyers refused to engage in the illegal act that Sistenich directed him to do.

24.     Conyers expressed an unwillingness to follow Sistenich's instructions to engage in the illegal acts.

25.     Conyers was terminated as a result of refusing to perform the illegal acts.

26.     Enlitic was aware or should have been aware that Conyer's refusal was based upon his reasonable belief that the act was illegal.

WHEREFORE, Plaintiff James Michael Conyers, respectfully requests that the Court enter judgment in his favor and against Defendant Enlitic, Inc., and award him all relief as allowed by law and equity, including, but not limited to the following:

a. Appropriate equitable relief;

b. Actual economic damages, in amounts to be determined at trial;

c. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d. Punitive damages, as allowed by law, in amounts to be determined at trial;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

g. Any such further relief as justice requires or the law allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

69409961;3

Date:  March 30, 2023

Respectfully submitted,

By  */s/  Thomas G. Pasternak*

Thomas G. Pasternak
Akerman LLP
71 South Wacker Drive
46th FL.
Chicago, IL 60606
Tel:  (312) 634-5700
Email:  thomas.pasternak@akerman.com

Attorneys for Defendant
*James Michael Conyers*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of March, 2023 I electronically filed the **ANSWER AND COUNTERCLAIM** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Orion Armon, Bar No. 34923
> oarmon@cooley.com
> Andrew D. Barr, Bar No. 49644
> abarr@cooley.com
> 1144 15th Street, Suite 2300 Denver, CO 80202-2686
> Telephone: +1 720 566 4000
> Facsimile: +1 720 566 4099
> oarmon@cooley.com
>
> *Attorneys for Plaintiff Enlitic, Inc.*

/s/  *Thomas G. Pasternak*
Thomas G. Pasternak

69409961;3